# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| FANNIE SMEDLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:03-cv-00993-JEO |
| | ) | |
| EBSCO INDUSTRIES, INC., and | ) | |
| EBSCO MEDIA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This is an employment discrimination case involving claims of race discrimination in the employment decisions involving Fannie Smedley (hereinafter "the plaintiff" or "Smedley") by EBSCO Industries, Inc., and EBSCO Media (hereinafter "the defendants" or "EBSCO") brought pursuant to Title VII of the Civil Rights Act of 1964 and Title 42, United States Code, Section 1981. (Complaint).[1] It is presently before the court on the defendants' motions for summary judgment and to strike certain of the plaintiff's submissions. (Doc. 19 & 43).

In her response, the plaintiff abandons her original retaliation, hostile environment, negligent retention and supervision, and intentional infliction of emotional distress claims. (Response at p. 21).[2] Accordingly, only her discrimination in termination and overtime claims remain. They will be addressed in detail in this opinion. Premised on the briefs of the parties and the record, the court finds that the defendants' motion to strike (doc. 43) is due to be granted in part and denied in part and the motion for summary judgment (doc. 19) is due to be granted.

---

[1] The plaintiff's complaint is located at document 1.

[2] The plaintiff's response is located at document 41.

# I. BACKGROUND[3]

The plaintiff, who has a high school equivalency degree and has taken some dental assistant classes at the University of Alabama, began working for EBSCO on or about December 16, 1985, in the housekeeping department, where she worked for two years.  (Smedley Dep at p. 101 & Ex. 6 at p. 4).[4]  Prior to working for EBSCO, she worked as a machine operator, warehouse packer, and housekeeper.  (*Id*., Ex. 6 at p. 3).  In 1989, despite having no prior experience in the prepress or commercial printing industry, the plaintiff received a transfer from housekeeping to EBSCO's Prepress Department as a Proofer Operator in the conventional prepress area.  (Smedley Dep. at p. 67 & Ex. 6. at p. 3).  She also received training during 2001 in platemaking.  (*Id*. at pp. 115-16 & Ex. 10).  The plaintiff worked as a conventional/analog proofer for the defendants until July 8, 2002, when her employment was terminated.  (*Id*. at p. 76 & Ex. 2).

The plaintiff contends that she was discriminated against when her position was eliminated and her employment was terminated, while other employees were not terminated but instead were placed in different positions.  (Complaint at pp. 4-5).  The defendants assert that she cannot make out a *prima facie* case in that she cannot present sufficient evidence that the defendants intended to discriminate against her when she was terminated.  (Brief at p. 15).[5]  The defendants further contend that the plaintiff cannot rebut their legitimate, non-discriminatory

---

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).  Many of the facts are undisputed.

[4]The plaintiff's deposition is located at document 21, attachment 1.  The exhibits are attached thereto.

[5]The defendants' memorandum in support of the motion for summary judgment (hereinafter "Brief") is located at document 20.

reasons for eliminating the proffer operator position and for her layoff.  (*Id*. at p. 17).

## II.  MOTION TO STRIKE

The defendants ask the court to strike certain portions of the affidavits submitted by the plaintiff in opposition to the motion for summary judgment.  (Doc. 43).  The plaintiff did not respond to the defendants' motion.  FEDERAL RULE OF CIVIL PROCEDURE 56 states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).  "If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion [or portions]."  *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc*., 1993 WL 229601, *2 (M.D. Fla. June 23, 1993) and *Barnebey v. E.F. Hutton & Co*., 715 F. Supp. 1512, 1529 (M.D. Fla. 1989).  "In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form."  *Denney v. City of Albany*, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) (citing *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)); *see McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (otherwise admissible evidence may be submitted in an inadmissible form at the summary judgment stage), *aff'd*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997).

In the first instance, the defendants assert that the court should strike paragraph 7 of the plaintiff's affidavit where she states that "Jan Choraitis[6] had not had as much formal training

---

[6]At some point, Choraitis's name changed to Trucks.

from Mike Sims as I had in platemaking. . . .  It was evident Choraitis had no prior platemaking

experience."  (Doc. 43 at p. 3).  The defendants contend that these statements are due to be struck

because the plaintiff has no personal knowledge about Choraitis's background or experience

prior to coming to EBSCO.  To the extent the plaintiff asserts Choraitis did not have as much

training from Sims as she did, the motion is due to be denied.  The plaintiff was employed in the

same area and she would have had the opportunity to observe what formal training occurred.

The court cannot find that this evidence is incapable of being reduced to an admissible form at

trial.  Accordingly, the motion is due to be denied as to this evidence.  To the extent she

comments in conclusory fashion on Choraitis's "prior platemaking experience," the motion is

due to be granted because the record fails to demonstrate that she had knowledge of Choraitis's

prior experience and training or the lack thereof.

   The motion next seeks to strike portions of the ninth paragraph which provides as

follows:

>   My qualifications . . . were superior to those of Jan Choraitis simply
> because Jan was not a proofer nor a platemaker.  Jan was a pre-flight person in
> another department before she came to proofing.  My experience . . . was superior
> to Frances Brown.  I also believe that my qualifications were superior to Jeff
> Odum's as far as proofing is concerned because I was an experienced proofer
> when Odum became a proofer.

(Doc. 43 at p. 3 (citing Smedley's Aff. at ¶ 9)).[7]  The defendants contend that the evidence is due

to be struck because the plaintiff has no personal knowledge about her co-worker's experience or

qualifications.  (Doc. 43 at p. 3).  They further contend that she did not have any supervisory

responsibilities for evaluating her co-workers.  (*Id.*).

---

[7] Smedley's affidavit is located at document 42, exhibit A.

The court finds that this aspect of the motion is due to be granted in part and denied in part.  To the extent that the plaintiff makes conclusory statements, the motion is due to be granted.  To the extent she makes factual statements, for example, that Choraitis was in pre-flight before she came to proofing, the motion is due to be denied.

The motion next seeks to have the court strike paragraphs 14-21 of the plaintiff's affidavit.  To the extent that those paragraphs contain factual statements, the motion is denied.  To the extent that the plaintiff's affidavit includes unsupported conclusory statements, the motion is due to be granted and those items will not be considered by the court.

The defendants next challenge paragraphs four and five of Carl Robertson's affidavit, which provides that he complied a list of employees for a supervisor "[s]ometime in the year prior to Ms. Smedley's termination."  (Doc. 43 at p. 3 (citing Robertson Aff. at ¶ 4)).[8]  According to the defendants, Robertson then speculates that the list is related to the selection of the plaintiff for layoff.  The defendants dispute this, stating that there is no evidence to support his conclusion.  (Doc. 43 at p. 3).  Absent more, the court would agree with counsel for the defendants.  However, Robertson's affidavit explicitly states that he "understood that this list was to be used by Ms. Sims in eliminating employees due to financial cutbacks at EBSCO." (Robertson Aff. at ¶ 4).  He goes on in the next sentence to say that "Ms. Sims specifically told [him] that employees were to be eliminated due to the financial situation the company was in.  Ms. Sims made no comment to me that positions or people were to be eliminated due to any change in technology.  I was told that I would have to lay-off several workers due to financial reasons."  (*Id.*).  The relevance of this evidence is arguably established when the objected-to

---

[8]Robertson's affidavit is located at document 42, exhibit B.

paragraph is considered in the context of the remainder of the affidavit and the case. The motion is, therefore, due to be denied as to this aspect.

Lastly, the defendants challenge the plaintiff's submission of exhibits 38 and 39, summarizing the time records of employees Bruce Hopper and Janice Trucks (formerly Choraitis). (Doc. 43 at pp. 3-4). They assert that the plaintiff has failed to properly authenticate the same. In the motion, counsel for the defendants note that they relied on one of the documents contained in exhibit 38 in their motion. However, that exhibit was properly authenticated by Brian Wilson's affidavit. (*Id*. at p. 4 and n.1). Because exhibit 39 was not authenticated in any fashion, it is due to be struck.[9]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 608, 26 L. Ed. 2d 142 (1970).

---

[9]For completeness, however, the court has examined both documents in its later analysis of the overtime issues.

6

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) & (b).  Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## IV.  DISCUSSION

As previously noted, the defendants contend that the plaintiff has not established a *prima facie* case in that she has failed to show that her termination was racially motivated.  (Brief at pp. 15-17).  Additionally, they argue she has failed to rebut their legitimate non-discriminatory reasons for eliminating the plaintiff's position and terminating her.  (*Id.* at 17).

## A.  The Plaintiff's Title VII Claims

Because the plaintiff does not present any direct evidence of discrimination, the court

must apply the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.

Ed. 2d 668 (1973), standard.[10]  The plaintiff must demonstrate "intentional discrimination."

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d

207 (1981).  The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive

is critical" in a disparate treatment case.  *International Bhd. of Teamsters v. United States*, 431

U.S. 324, 335-36 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).  *See also United States Postal*

*Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983);

---

[10]Although the plaintiff argues that the correct standard is provided by the United States Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003), this court will continue to follow the *McDonald Douglas* burden-shifting approach absent further direction from the Supreme Court or the Eleventh Circuit Court of Appeals.  This court recognizes that some courts have concluded that *Desert Palace* does alter (*see, e.g.*, *Carey v. Fedex Ground Package System, Inc.*, 321 F. Supp. 2d 902, 915-16 (S.D. Ohio 2004) (Marbley, J.); *Dunbar v. Pepsi-Cola General Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1196 (N.D. Iowa 2003) (Bennett, C.J.)) or abrogate (*see, e.g., Dare v. Wal-Mart Stores, Inc.*, 267 F. Supp. 987, 990-91 (D. Minn. 2003) (Magnuson, C.J.)) the *McDonnell Douglas* burden-shifting approach.  However, others have found that it does not.  (*See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("*Desert Palace* had no impact on prior Eighth Circuit summary judgment decisions.") *Herawi v. State of Alabama Dept. of Forensic Sciences*, 311 F. Supp. 2d 1335, 1345-46 (M.D. Ala. 2004) (Thompson, J.), *Sanders v. City of Montgomery*, 319 F. Supp. 2d 1296, 1314 (M.D. Ala. 2004) (J. Fuller).

The Fifth Circuit following *Desert Palace* has noted a "modified" approach in analyzing an ADEA discrimination case. It articulated its "integrated approach" as follows:

> [T]he plaintiff must still demonstrate a *prima facie* case of discrimination; the defendant must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  *See also*, *Warren v. Terex Corp.*, 328 F. Supp. 2d 641, 644 (N.D. Miss. 2004) ("In light of *Desert Palace* as interpreted by *Rachid*, Title VII discrimination and ADEA plaintiffs in this circuit are not limited to proving that a defendant's stated nondiscriminatory reasons for terminating them are false or otherwise pretextual; they may also prove that 'the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic.' *Id*.  A plaintiff's failure to prove the falsity of a defendant's stated nondiscriminatory reason has doomed many a discrimination case in this circuit, and the mixed-motive alternative set forth in *Rachid* will thus likely prove to be a lifeline for many discrimination cases which would otherwise not have survived summary judgment.").  *Accord Moore v. McCullough*, 2005 WL 66230, *2 (N.D. Miss. January 4, 2005).

The court also notes that regardless of the test applied in this matter, the result would be the same.

*Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983).

The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. 792.  She can establish a *prima facie* case under Title VII by showing: (1) that she was a member of a protected class; (2) that she was qualified for the position at issue; (3) that an adverse employment action was taken against her; and (4) that the employer treated similarly situated employees outside the protected class more favorably.  *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309 (11th Cir. 1999); *see, e.g., Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir.), *superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  However, there is more than one method by which a plaintiff may establish a *prima facie* case.  Where a position is eliminated or there is a reduction in force, the criteria are slightly different.  In such a case, the plaintiff must show "(1) that she was a member of a protected group and was adversely affected by an employment decision; (2) that she was qualified for her own position or to assume another position at the time of the discharge; and (3) sufficient evidence from which a rational fact finder could conclude that her employer intended to discriminate against her in making the discharge decision."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (citing *Benson v. Tocca, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997)); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990); *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045-46 (11th Cir. 1989).

Under the *McDonnell-Douglas* framework, if the plaintiff establishes a *prima facie* case,

a presumption is formed that the defendant discriminated against the plaintiff, and the burden

then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997 ), *cert. denied*, 522 U.S.

1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998) (citing *McDonnell-Douglas Corp. v. Green*, 411

U.S. at 802, 93 S. Ct. at 1824).  Once the defendant articulates a "legitimate, nondiscriminatory

reason" for its actions, any presumption of discrimination arising out of the *prima facie* case

"drops from the case."  *Burdine*, 450 U.S. at 255 n.10; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff is then afforded an

opportunity to demonstrate that the defendant's proffered reason was not the true reason for the

employment decision.  *Combs*, 106 F.3d at 1528.

### B.  Termination Claim

#### 1.  *Prima facie* case

The defendants concede that because the plaintiff is a member of a protected class

(African-American), her position was eliminated, and she was qualified for her former position,

the plaintiff can satisfy the first two elements of a *prima facie* case.  (Brief at p. 16).  The

defendants, however, contend that the plaintiff cannot meet the third element that requires her to

present evidence from which a reasonable jury could conclude that the defendants intended to

discriminate on the basis of the plaintiff's race when her position was eliminated.  (*Id*.).  Thus,

the initial question for this court is whether the plaintiff has established that the defendants

intended to discriminate against her when her position was eliminated.  To support her *prima*

*facie* case of discrimination, the plaintiff presented statistical evidence (Response at pp. 12-13) as

well as evidence regarding the treatment of several comparators.  She also asserts that the

10

defendants' discriminatory intent is evidenced in their shifting reasons for her termination.  (*Id*. at pp. 8-11).

## 2.  Statistical evidence

The plaintiff relies on EBSCO Industries EEO-1 figures for 2002 as statistical evidence of racial discrimination.  (Response at pp. 12-13).  According to the plaintiff, these figures indicate that when the plaintiff's position was eliminated, the total number of black females employed by EBSCO Industries decreased from 19 to 18.  (*Id*. at p. 13).  In addition, these figures show that in 2002 the total number of black males employed by EBSCO Industries decreased from 33 to 30. (*Id*.).  According to the plaintiff, during 2002 there was an increase of nine white females (from 75 to 84) and two white males at EBSCO Industries, and an overall increase of seven employees (from 244 to 251).  (*Id*. at pp. 12-13).  The plaintiff asserts that because the number of black employees decreased while the number of white employees increased, "her race was a 'motivating factor in the defendants' decision to terminate" her.  (*Id*. at p. 14).

The defendants contend that these figures are misleading because they represent employment figures for both EBSCO Media, where the plaintiff was employed, and EBSCO Promotional Products, and thus do not accurately reflect the plaintiff's treatment at EBSCO Media.  (Reply at p. 5).  The defendants present their own statistical evidence showing that since 1999 thirteen employees have been laid off in the Prepress Department at EBSCO Media because their positions were eliminated, and the number of employees in the department has decreased from 53 to 19 employees since 1999.  (Sims Aff. at ¶ 16).

The court finds that the statistics provided by the plaintiff are not sufficient because they only reflect a decrease in the number of black employees at EBSCO Industries.  A decrease in the

number of employees may reflect employee terminations, but also may reflect voluntary employee departures and retirement. A decrease in the number of employees in a protected group might well be indicative of discrimination in certain instances. However, where there is no indication as to how many of these employees were terminated and how many voluntarily departed, a mere showing of a decrease is insufficient to show discrimination and does not establish a *prima facie* case of discrimination. This is particularly true in the present matter where the plaintiff's statistics are broadly based and overly inclusive for analytical purposes. Additionally, there is no evidence rebutting the defendant's statistics for the Prepress department discussed in the last paragraph.

### 3. Individual comparators

Because the court finds that the statistical evidence presented by the plaintiff is insufficient to establish a *prima facie* case of discrimination, the next question to be answered is whether or not the plaintiff was treated equally to similarly situated employees. The plaintiff states that she was not afforded the same opportunities as EBSCO's white employees. In support of her position, she lists in her complaint and her response to the defendants' motion for summary judgment several EBSCO employees as comparators. The court finds that the plaintiff was not similarly situated at the relevant time to any of the employees identified as comparators. Therefore, the plaintiff has not met the burden of establishing her *prima facie* case.

### a. Background – Plaintiff's job, the shift in technology, and the implementation of a quality control program

As a Proofing Operator in conventional prepress, the plaintiff checked "analog" proofs, which were proofs produced conventionally (or manually by hand). (Smedley Dep. at pp. 122-23

& Ex. 12 at D026; Sims Aff. at ¶ 5).  She was responsible for producing analog proofs from furnished film by "burning" the image from the film into a proofing material, using a vacuum frame and exposure to light.  (Smedley Dep. at pp. 60-61, 122-23 & Ex. 12; Sims Dep. at pp. 36, 52).  Additionally, she made sure that the proofs were cut down and folded accurately and put in the right order before leaving the proofing area.  (*Id.*).  The accuracy of these proofing procedures was critical to making a high-quality proof that accurately simulated the final printed product.  (Sims Aff. at ¶ 5).  The job, however, was a non-skilled position which required no previous experience, as illustrated by the plaintiff's promotion thereto from her housekeeper position.  (*Id.*).  The Proofer Operator job was "procedural or routine" in that it required an employee to perform the same process, over and over again.[11]  (*Id.*).

In the late 1990s, the printing industry began shifting from conventional (manual) prepress to electronic (computerized and digital) prepress, and EBSCO followed suit.  (Sevier Dep. at pp. 36-37;[12] Sims Aff. at ¶ 3).  As a result, there were more Prepress employees at EBSCO than required by the declining workload and new technology.  (*Id.*).  Consequently, the new digital technology and machines eliminated the need for several positions and a number of Prepress employees.  (Sims Aff. at ¶ 4; Hopper Dep. at pp. 9-10).[13]  At the same time, EBSCO tried to reduce the costs of spoilage or work that needed to be redone in Prepress.  (*Id.*).  In an effort to decrease the spoilage costs, in 1998, a new quality control program (using new and

---

[11]The plaintiff disputes the fact the proofing job was not a "skilled" position.  (Smedley Aff. at ¶ 15).  She states that she was trained to do the job and, like many other jobs, it was done "over and over."  (*Id.*).  The court does not find this dispute to be significant under the circumstances.

[12]Landers Sevier, IV's deposition is located at document 21, exhibit 3.

[13]Bruce Hopper's deposition is located at document 21, exhibit 7.

current employees) was implemented in the Prepress Department.  (Sims Aff. at ¶¶ 3-4).

Prior to changing the quality control process, employees were required to check their work before sending it to the next step in the Prepress process.  (*Id*. at ¶ 15; Smedley Dep. at pp. 118-23 & Ex. 12).  The new Quality Control Operator positions, however, were designed to check work against the way the job had been produced or imposed in electronic prepress.  (*Id*.).  Quality Control Operators need to be either a "Journeyman Stripper" or have appreciable stripping knowledge.  (Sevier Dep. at p. 57; Sims Dep. at 37-46; Sims Aff. at ¶ 17).

"'Stripping' is a term used to describe the process of manually hand-registering up to four layers of film, dot for dot, one upon the other, first by individual page, then imposing or positioning the individual pages into a layout or format based on detailed specifications required by the pressroom and bindery."  (Sims Aff. at ¶ 7).  Usually, "[i]t takes approximately seven years of experience to learn the stripping process and be considered a 'Journeyman Stripper.'" (*Id*.).  Due to the shift to electronic prepress, the manual (or conventional) hands-on handling of film "has now been replaced by 'Imposition Operators,' who produce the same final film product, but do so through an electronic process using Macintosh computers and digital output devices."  (*Id*.).  "Journeyman Stripper" knowledge, however, "has become essential in the overall quality control of jobs being produced electronically."  (*Id*.).

"As the Prepress began to shift from conventional to electronic prepress, the analog proofing (such as that done by the plaintiff), began to be phased out."  (*Id*.).  Digital proofs replaced analog proofs and were printed through the use of ink jet digital printers from the electronic prepress.  (*Id*.).  As a consequence, the plaintiff's job duties changed.  (Smedley Dep. at pp. 62-63).  The plaintiff was required to take the digital proofs and to fold and trim them as

14

needed.  (Sims Aff. at ¶ 8; Smedley Aff. at ¶ 17).  If a job required drilling, the folded proof

would also be drilled, which is a manual procedure.  (*Id*.).  The plaintiff then sent the digital

folded/trimmed proof to a Quality Control Operator for more thorough checking prior to the

proof moving to the customer service area for release to the customer for review and approval.

(*Id*.).  The plaintiff admits that by the time she was released "the workload for a proofer had

decreased tremendously."  (Smedley Dep. at p. 61).

In March 2001, the plaintiff was offered and received training in platemaking in order to

provide her with additional skills and job duties.  (*Id*. at pp. 115-16).  Platemaking utilizes the

same basic steps as analog proofing, except that the film is used to burn the image to a metal

plate, instead of to a proofing material.  (*Id*. at pp. 44-46).  Once the plate is processed it contains

all of the images that were on the film and then is sent to the pressroom to be printed on sheet-fed

presses.  (*Id*.).

The plaintiff contends that she was discriminated against when her job was eliminated

and her employment was terminated.  Specifically, she asserts that she was treated differently

than five white employees.  (Response at pp. 13-19).  For the reasons stated below, the court

finds that the plaintiff has not established a *prima facie* case of discrimination because she has

failed to show that she was similarly situated to these five individuals at the time the adverse

employment decision occurred.

### b.  Frances Brown

Frances Brown was initially hired as a Quality Control Operator on November 2, 1998,

which primarily required her to check the "folded down" digital proofs received from the Proofer

Operators, to assure they were accurate and met customer specifications.  (Brown Dep. at pp. 5-8;

Sims Aff. at ¶ 11).  This was done just before a proof moved back to the customer service department and was forwarded to the respective customer for their signed off approval to print. (Brown Dep. at pp. 5-8; Sims Aff. at ¶ 12).  She was retained after the plaintiff was terminated.

The plaintiff contends that Brown, who had been employed for only three years when the plaintiff was terminated, did not have any stripping and platemaking experience.  (Response at p. 17 (citing Brown's Dep. at pp. 11, 22-23, 38)).  She also contends that her position as Proofer was not eliminated, but rather was merely renamed Quality Control Operator.  (*Id.* at pp. 17-19). Still further, the plaintiff asserts that she was limited by Sims as to the training she received.  (*Id.* at p. 17).

At the outset, the court finds that there is a difference between the work done by, and skills required of, a Proofer and a Quality Control Operator.  First, analog proofing, and thus the Proofer position as it was previously known, was eliminated by new machinery acquired by EBSCO.[14]  (See Sims Aff. at ¶ 5).  Second, Quality Control involves digital ink jet proofing, which, unlike analog proofing, requires stripping knowledge, which Smedley did not have. (Sims Aff. at ¶ 6).

The plaintiff initially contends that she was discriminated against when Brown was hired because Brown, just like the plaintiff, had no previous stripper knowledge.  Despite the defendants' contention that Brown's previous employment required her to be knowledgeable of the stripping process, the plaintiff argues that Brown did not have any actual experience with stripping beyond observing others.  (Response at p. 17).  What Brown stated was that she was

---

[14]Although the change did not eliminate the need for proofing, it certainly changed the way things had been done previously.  As noted by Sims, "[t]he new process initially reduced and eventually eliminated the need for the Proofer Operator job."  (Sims Aff. at ¶ 8).

knowledgeable of the stripping process because she had to learn it during her previous

employment at Stevens Graphics.  (Brown Dep. at p. 20).[15]  Even assuming that the plaintiff and

Brown were similarly situated at the time Brown was hired because neither had all the actual,

"hands-on" skill required for the Quality Control Operator position, the plaintiff did not complain

about any adverse employment action at that time.  In addition, there is no showing that the

plaintiff requested, and was denied, additional training to qualify her for the Quality Control

Operator position at the time Brown was hired or any time thereafter.[16]  Brown appears to have

received the appropriate training to perform certain of the duties of a Quality Control Operator

after she began working for the defendant.  Thus, if it is again assumed that Brown and the

plaintiff were similarly situated at the time Brown was hired, the plaintiff and Brown were not at

the time the plaintiff's position was eliminated.  At the time the plaintiff's position was

eliminated, she and Brown held different jobs, and thus were not similarly situated.  The

plaintiff's assertion that Brown should have been terminated before her is without merit since the

defendants did not make a choice between two similarly situated employees, but rather decided

to eliminate a specific position.  Additionally, the merging of the duties of a proofer with the

quality control operator position does not constitute an impermissible action under the

circumstances.

### c.  Jan Choraitis

Jan Choraitis was hired as a Quality Control/Scheduling Coordinator Operator in

---

[15]Brown's deposition is located at document 21, exhibit 6.

[16]In her affidavit, Smedley states, "While I was employed with EBSCO Media, everyone in the conventional prepress proofing department was allowed to go downstairs and train on the electronic prepress but me. . . .  All of these employees are white.  I am black."  (Smedley Aff. at ¶ 3).  What is conspicuously absent from the affidavit is any statement that she asked to receive such training and was turned down.

September 1999.  (Choraitis Dep. at p. 6).[17]  She has a Bachelor of Fine Arts in Graphics and Business from the University of Montevallo and had approximately twenty years of experience in printing and prepress at the relevant time.  (Sims Dep., Ex. 1 (Application)).  Prior to coming to EBSCO, Choraitis worked at Unitech Prepress Solutions, Inc., as a Journeyman Stripper, and assisted in all areas of prepress, including platemaking, electronic stripping, four color stripping, proofing, camera work, inventory, and outside sales.  (Choraitis Dep. at p. 6-12).  Additionally, she had conventional stripping, graphic, and typesetting experience.  (*Id*.).  When she was hired at EBSCO, Choraitis primarily worked in the electronic prepress performing quality control and scheduling work.  (*Id*. at pp. 35-36).  Her current job requires her to have, among other things, extensive experience in stripping or quality control in the electronic and conventional prepress areas and overall experience in the printing and prepress industry.  (Sims Dep., Ex. 1 at D256).  By contrast, the plaintiff's skills in the prepress were limited to analog proofing and platemaking.

The court, therefore, finds that the plaintiff and Choraitis are not similarly situated for a number of reasons.  First, the plaintiff did not have the electronic prepress or stripping knowledge that Choraitis had to qualify her for employment as a Quality Control Operator.  (Sims Aff. at ¶ 19).  Second, they were performing in significantly different positions at the time of the plaintiff's termination.

### d.  Bruce Hopper

Bruce Hopper was hired at EBSCO on August 17, 1998, as a Quality Control/Stripping Coordinator in the Prepress Department, and worked on the second shift.  Hopper and several other employees were laid off from EBSCO in 2001, prior to the plaintiff's termination, when

---

[17]Choraitis' deposition is located at document 21, exhibit 5.

technology eliminated the need for the second shift.  (Hopper Dep. at p. 9; Sims Dep., Ex. 2 at

D305).[18]   Hopper was rehired at EBSCO as a temporary/on-call employee on February 15, 2002,

because the pressroom started a "swing" shift (which operated 24/7) and needed a Prepress

employee on-call to assist with stripping, rework, plate making, or other prepress needs after

hours or on weekends.  (Sims Aff. at ¶ 22; Sims Dep. at pp. 82-87 & Ex. 2 at D275-76; Hopper

Dep. at pp. 6-8).  Three weeks prior to Smedley's termination, Hopper's status changed from

temporary to part-time employee.  (Hopper Dep. at p. 7).  Bruce Hopper has since been hired full

time.  (*Id.*).

The plaintiff was not qualified for the position held by Hopper, who has worked in the

printing and prepress industry for over forty-five years.  (Sims Dep., Ex. 2 at D275-76).  The

plaintiff contends that Hopper's only duty was to make plates, for which she was qualified.

(Response at p. 21; Doc. 44 at 6).  While Hopper does have some plate making duties, he was

rehired because his skills and experience with stripping, reworking, plate making, and other

prepress needs.  (Sims Aff. at ¶ 22).  He was also hired because of his ability to handle printing

problems and to fill in wherever necessary on an as needed basis.  (Sims Dep. at p. 82).  The

plaintiff did not have the diversity of knowledge, including stripping or prepress, to qualify for

this position.  In 2002, the plaintiff's skills were limited to proofing analog proofs and plate

making.  Hopper's extensive experience in quality control, stripping, proofing, plate making, and

the pressroom clearly distinguished him from the plaintiff.

### e.  Jeff Odom

Jeff Odom also worked a conventional analog Proofer Operator job.  (Sims Aff. at ¶ 20).

---

[18]Hopper's deposition is located at document 21, exhibit 7.

Sometime in 2001, however, Odom's duties expanded beyond those of a proofer. Ultimately, he worked as a digital output operator. (Sims Dep. at pp. 27-29). While Odom was still classified as a "Proofer Operator," he was no longer performing "Proofer Operator" job duties after June 2002. (Sims Aff. at ¶ 20). When new equipment and machinery in the electronic prepress was installed, EBSCO needed someone with mechanical and computer skills to perform maintenance work, operate the machinery, and output digital proofs. (*Id*.). Odom had worked as a mechanic helper and had the necessary mechanical skills to perform this job.[19] (*Id*.). Additionally, while he was a Proofer Operator, Odom was responsible for the maintenance on the analog proofing devices. (*Id*.). Odom was moved to electronic prepress to use his maintenance and mechanical skills to upkeep the machines and pull digital proofs. (*Id*. at ¶ 21). From 2001 until June 2002, Odom occasionally did some Proofer Operator duties when the workload required. (*Id*. at ¶ 21). Therefore, the court finds that the plaintiff was not similarly situated to Odom because her skills were limited to analog proofing and platemaking and she lacked the mechanical and computer skills necessary to perform Odom's job duties in the electronic prepress area.[20] (*Id*.).

### f. Tracy Buzbee

The plaintiff also mentions Tracy Buzbee, a white female, as an additional comparator. (Response at p. 14). She contends that when Buzbee's position was eliminated, the defendants moved her to the corporate office, then to Promotional Products, and finally, back to EBSCO

---

[19]There is no evidence in the record that the plaintiff ever functioned as a mechanic helper. Although she may have had some knowledge and experience in the area, she did not have this experience.

[20]The court notes that the plaintiff asserts in her affidavit that she disagrees with Sims' "comment that [she] did not have the mechanical skills or understanding on [sic] how to clean and service the proofing equipment." (Smedley Aff. at ¶ 20). She further asserts that she possessed the skills necessary to clean and service the proofing equipment. (*Id*.). She also states that "Sims never asked me about my skills in these areas and had no knowledge that [she] was unable to perform the job duties." (*Id*. at ¶ 21). Accepting all these statements, as the court must, it is still clear that the plaintiff's experience was limited to the conventional or analog equipment.

Media.  (*Id*.).  Buzbee, however, is not a proper comparator because she worked in the Customer Service Department, not the Prepress Department.  (Reply at p. 7).  There is no evidence before the court that the plaintiff applied for a position at any other EBSCO entity after her termination and was denied a position for which she was qualified.  (*Id*)  *See Smith v. J. Smith Lanier & Co*., 352 F.3d 1342, 1345 (11th Cir. 2003) (holding an employee who did not submit an application for rehire did not meet *prima facie* case of discrimination in a reduction in force case where the employer had publicized an open position).  Additionally, there is no evidence that Sims was involved in the decision to transfer Buzbee.

For the foregoing reasons, the court finds that the plaintiff has failed to establish a *prima facie* case of discrimination in regard to her termination claim.

### g. Other matters

To the extent that the plaintiff asserts that the defendants have articulated "shifting" reasons for eliminating her position that demonstrate their discriminatory intent, the court disagrees.  The plaintiff asserts that the defendants have

> articulated, currently, and in this motion [for summary judgment], that it was technology reasons that mandated plaintiff's job elimination. . . .  When Smedley was terminated she was told that she was being laid off and "it was a management call." . . . .  Plaintiff's supervisor, Carl Robertson, was told that Smedley was to be terminated for financial reasons within the company. . . .  And, when replying to the EEOC charge of discrimination, Debbie Martin, Human Resource Director, provided a hybrid of reasons stating Smedley's job was eliminated due to financial cutbacks and employees who were kept had to be versatile and have multiple job skills so they can work in multiple production areas.  [ ]

(Response at pp. 8-9 (citations and footnote omitted)).  The plaintiff further cites *Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189 (11th Cir. 2004), for the proposition that a "defendant's 'shifting' reasons for [a] plaintiff's termination creates credibility issues for the

defendant to be determined by the trier of fact and that these credibility issues, created by the shifting reason for termination, can infer intentional discrimination."

In *Cleveland*, the plaintiff was terminated from her television host position.  She brought a claim under the Americans with Disabilities Act.  The defendant asserted that she was terminated for participating in an unauthorized infomercial.  The jury returned a verdict in her favor and the trial court granted the defendant's motion for judgment as a matter of law.  The plaintiff appealed and the Eleventh Circuit Court of Appeals held, among other things, that the trial court erred in granting the defendant's motion.  It stated:

> . . . .  The evidence discrediting HSN's proffered reason for terminating Cleveland along with other evidence of discrimination provided a sufficient basis for the jury's verdict.
>
> As stated, HSN allegedly terminated Cleveland for participating in an unauthorized infomercial.  When pressed on the reason why infomercials were prohibited, Concello shifted from a contract, to a non-compete agreement, to an unwritten policy, to a standard industry practice.  These inconsistent reasons allowed the jury to question his credibility.  Once Concello's credibility was damaged, a rational jury could infer that he did not fire Cleveland because of the infomercial, but rather because of her disability.

*Cleveland*, 369 F.3d at 1194.

The court finds *Cleveland* to be distinguishable from the present case.  In *Cleveland*, the explanations were clearly inconsistent.  Concello's response shifted dramatically from one document to another, to an unwritten policy, and finally to industry practice.  In contrast, the defendants' reasons do not demonstrate similarly dramatic inconsistencies.  In the brief in support of the motion for summary judgment, the defendants assert that technology changes mandated the job elimination.  This is not inconsistent with the statement to Smedley at the time of her termination that her lay off was "a management call."  It is also not inconsistent with the

defendants' statement to the EEOC that she was terminated due to the elimination of her position.[21]  Sims' statement within a year of the plaintiff's termination to Robertson that "financial difficulties" necessitated layoffs is not sufficient to demonstrate a *prima facie* case of discrimination.  Robertson was only able to date this statement as having been made by Sims within a year of the plaintiff's termination.  (Robertson Aff. at ¶ 4).  He was not otherwise involved in the decision-making process at the time of the plaintiff's termination in July 2002.  The court finds this statement insufficient to demonstrate *prima facie* intent to discriminate premised upon the plaintiff's race.

### C.  Overtime Discrimination Claim

The plaintiff alleges that she was discriminated against in the awarding of overtime hours.  She bases this claim on a comparison between the number of overtime hours she worked and the number of overtime hours Jeff Odom worked in 2000, 2001, and 2002.  (Response at pp. 20-21).  As previously stated, the plaintiff and Odom were not similarly situated for the entire period at issue, and thus a comparison between the plaintiff and Odom is not entirely appropriate.  At best, the plaintiff and Odom could be considered to have been similarly situated in 2000 and part of 2001 while they were both working as proofers.  The plaintiff's evidence indicates that in 2000 Odom worked 382.04 hours of overtime while the plaintiff worked 294.64 hours of overtime.  (*Id*.).  This amounts to a difference of 87.4 hours of overtime for the year.  When this difference is broken down over a typical 50 week work year, the disparity is reduced to a difference of approximately 1.748 hours.  This difference alone is not significant enough to establish a *prima*

---

[21]Specifically, the defendants stated that the position was eliminated due to "streamlining production and reducing overall cost."  (Martin Letter to EEOC at p. 2 (Doc. 42 at Ex. 19)).  The defendants further stated that the decisions as to which positions to eliminate were premised on individual skills and experience and that the plaintiff's "job skills were limited to proofing and platemaking."  (*Id*.).

*facie* case of discrimination.  In addition, although the plaintiff did not name Brown, Choraitis, or Hopper as comparators for purposes of overtime, and the court has already found that the plaintiff was not similarly situated to Brown, Choraitis, and Hopper, it is instructive that the plaintiff worked more overtime hours than Brown and Hopper in 2000.[22]

To the extent a comparison is appropriate for 2001, the difference between the overtime hours of Odom and the plaintiff would be 93.38 hours, which amounts to a difference of 1.8676 hours per week for a 50 week work year.  (*Id*.).  However, this must be considered in view of the other evidence that during the same time, the plaintiff was assigned more overtime than Brown, Choraitis, and Hopper.[23]

Finally, a comparison of the overtime while the plaintiff was still employed during 2002 with Odom's overtime hours for that same time period reveals that the plaintiff worked 97.33 overtime hours and Odom worked 155.79 overtime hours, for a difference of 58.46 hours, which amounts to a difference of less than 10 hours per month, or roughly 2.5 hours per week.  (Wilson Aff. at Ex. A).  Because the plaintiff and Odom are not similarly situated during 2002, the court stresses that the comparisons of overtime hours is merely for the purpose of illustrating that there is not a large enough disparity alone to establish discrimination in the awarding of overtime hours in this case.  Additionally, the plaintiff was awarded more overtime during this period than Choraitis and Hopper in 2002.[24]

---

[22] According to Exhibit A of Brian Wilson's Affidavit in 2000, Smedley worked 294.64 hours of overtime, whereas Brown worked 281.1 hours and Hopper worked 171.27.  Brian Wilson's affidavit is located at document 21, exhibit 9.

[23] According to Exhibit A of Brian Wilson's Affidavit in 2001, Smedley worked 320.58 hours of overtime, whereas Brown worked 260.07 hours, Choraitis worked 190.2 hours, and Hopper worked 71.24 hours.

[24] According to Exhibit A of Brian Wilson's Affidavit through the plaintiff's termination in 2002, she worked 97.33 hours of overtime, whereas Choraitis worked 82.91 hours and Hopper worked 38.92 hours.

The court also notes that the plaintiff worked more double time than anyone else in 2000 and 2001 and more double time until her termination in 2002 than Hopper and Choraitis. Premised on the foregoing evidence, the court finds that the plaintiff has failed to establish a *prima facie* case of discrimination in regard to the award of overtime hours.  There is simply insufficient evidence to support a conclusion that the defendant intended to discriminate against her in making the overtime decisions.

## CONCLUSION

Upon consideration, the court finds that the defendants' motion to strike (doc. 43) is due to be granted in part and denied in part and the motion for summary judgment (doc. 20) is due to be granted.  An order consistent with this court's findings will be entered.

The Clerk of the Court is **DIRECTED** to serve a copy of this memorandum opinion upon counsel of record.

**DONE**, this 30th day of September, 2005.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge